IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| G & C HOLDINGS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-10-1079-D |
| | ) |
| REXAM BEVERAGE CAN COMPANY | ) |
| and OLD REPUBLIC TITLE | ) |
| COMPANY OF OKLAHOMA, | ) |
| | ) |
| Defendants. | ) |

## ORDER

Before the Court are Plaintiff G & C Holdings, LLC's Motion for Summary Judgment [Doc. No. 40] and Defendant Rexam Beverage Can Company's Partial Motion for Summary Judgment [Doc. No. 50]. Both motions are fully briefed and at issue.[1] The parties' cross-motions involve the same factual record and intertwined legal issues and, thus, are addressed together.

### Procedural Background

Plaintiff filed suit in the District Court of Oklahoma County, Oklahoma, to terminate a real estate purchase agreement and obtain the escrow money it had paid under the agreement. Defendant removed the case based on diversity of citizenship, and filed counterclaims for breach of contract and specific performance or, alternatively, termination of the agreement and payment of the escrow money as liquidated damages, according to the terms of the agreement. During the pendency of the

---

[1] On January 11, 2011, the Court issued the Order for Interpleader requested by the parties, which ordered the dismissal of Defendant Old Republic Title Company of Oklahoma upon notice of payment to the court clerk of the escrow money. *See* Order for Interpleader [Doc. No. 25]. The Court has received no such notice, and thus, Defendant Old Republic Title Company remains a party to this action. This defendant has made no further filings in the case, however, and will be disregarded for purposes of summary judgment.

action, Defendant sold the subject property to a third party. Thus, the parties now agree that Defendant's counterclaim for specific performance is moot.

By their cross-motions, each party seeks a determination as a matter of law pursuant to Fed. R. Civ. P. 56 that it is entitled to the escrow money. In addition, the parties seek a determination of questions of liability and damages related to Defendant's counterclaim that Plaintiff breached the contract by refusing to complete the sale.

## Standard of Decision

Summary judgment is proper "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id*. at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id*.

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* Fed. R. Civ. P. 56(c)(1)(A). The Court's inquiry is whether the facts and evidence identified by the parties

present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## Statement of Facts

The relevant facts are undisputed. On February 12, 2010, the parties entered into a Real Estate Purchase Agreement regarding real property located in Oklahoma County, Oklahoma. Specifically, Defendant agreed to sell, and Plaintiff agreed to buy, commercial property at 3400 South Council Road in Oklahoma City for a purchase price of $2,144,000. The Agreement required Plaintiff to pay earnest money of $100,000 to be held in escrow by Old Republic Title Company. The Agreement provided for a "Due Diligence Period," which was a defined term that included, at least, the completion of certain "Restoration Work," which was also defined. *See* Pl.'s Mot. Summ. J., Ex. 1 [Doc. No. 40-1], §§ 6, 9 (hereafter "Agreement").[2] Because the provision defining the Due Diligence Period is critical to the parties' arguments, it is quoted in full, *infra*.

Defendant was required to perform the Restoration Work "[o]n or before March 31, 2010, and in accordance with Schedule 9." *See id*. § 9. The attached Schedule 9 detailed the scope of the work involved in dismantling manufacturing equipment and repairing a manufacturing and warehouse building. However, Defendant was also required to consult Plaintiff regarding the scope of Restoration Work, particularly with regard to "activities that would mutually benefit both parties (i.e., not removing certain structures or components)." *See id*. The provision stated requirements regarding Plaintiff's inspection and acceptance of the Restoration Work and Defendant's correction of unacceptable work.

---

[2] The Agreement also appears as Exhibit 1 to Defendant's Motion [Doc. No. 50-1], but for convenience, the Court provides only the first record citation. The same procedure will be followed as to other duplicate submissions by the parties.

During the Due Diligence Period, Plaintiff was permitted to terminate the contract "for any reason by providing [Defendant] with written notice of termination." *See id*. § 6.1. In the event of such termination, the Agreement authorized the escrow agent to return the earnest money to Plaintiff. Otherwise, Defendant was entitled to receive the earnest money "as liquidated damages and not as a penalty in the event [either or both parties] terminate the Agreement after the expiration of the Due Diligence Period." *See id*. § 6.2. The Agreement provided for a closing date "within ten (10) days after [Plaintiff] accepts the Restoration Work under Section 9 but in no event later than May 15, 2010, or such other day as [Plaintiff] and [Defendant] may otherwise agree in writing." *See id*. § 10.

Prior to the Agreement, an environmental assessment of the property had been done, and Plaintiff had received a "Phase I Report" prepared by an environmental consultant, Envision Environmental, Inc. *See id*. § 5. The Phase I Report included "a statement of recognized environmental conditions ('RECs') identified by Envision . . . [and] recommended testing, sampling or other investigatory activities at the Property with respect to the RECs (the 'Phase II Investigation')." *See id*. § 5.1. The Agreement required Defendant to begin implementing the Phase II Investigation "[a]s soon as reasonably practical," using either Envision or another consultant acceptable to Plaintiff. *See id*. The Agreement also described a "Phase II," which was to occur "[a]s soon as reasonably practical following the completion of the Phase II Investigation." *See id*. § 5.2. During Phase II, Defendant was required to "cause the Consultant to prepare a report of the investigation results, including the discovery of any Hazardous Materials (as hereafter defined) related to the RECs and present in soils or groundwater . . . ('the Environmental Matters')," and to "cause the Consultant to perform any and all corrective action," as defined by the Agreement.

*See id*.  The Agreement also stated the parties' rights and obligations with regard to any required corrective action, including the circumstances that would discharge Defendant's duty to correct Environmental Matters.  It expressly provided for "Termination Rights" with regard to environmental issues, as discussed further below.  Briefly stated, the parties disagree whether Defendant was required to complete the Phase II Investigation, deliver a report, or take any corrective action during the Due Diligence Period or prior to closing.

As of April 20, 2010, Plaintiff was still conducting its inspection of the Restoration Work, and informed Defendant by letter addressed to Defendant's broker that outstanding issues existed.  By letter from Defendant's counsel dated April 26, 2010, however, Defendant notified Plaintiff of its position that the Restoration Work had been completed, that Plaintiff had inspected it, and, since no written notice of unacceptable work had been received, Defendant assumed that Plaintiff had accepted the Restoration Work as provided by the Agreement.[3]  Accordingly, Defendant stated that the Due Diligence Period had ended, that Defendant was entitled to receive the earnest money, and that the closing date should "be on or before May 6, 2010."  *See* Pl.'s Mot. Summ. J., Ex. 4 [Doc. No. 40-4], ¶¶ 4-5.  Plaintiff immediately responded by objecting to Defendant's position regarding acceptance of the Restoration Work, and asserting Plaintiff's position that the Due Diligence Period "encompasse[d] the completion and preparation of the report of the Phase II Environmental Investigation (Section 5), and the provision of the completed report to [Plaintiff]."  *See id.*, Ex. 5 [Doc. No. 40-5], ¶ 4.  By letter dated April 29, 2010, Plaintiff provided written acceptance of the Restoration Work subject to six exceptions, one of which was the lack of a report of the Phase II

---

[3] Counsel also stated that Defendant had satisfied Sections 3 and 4 of the Agreement regarding title and survey work.  These provisions of the Agreement are not at issue.  However, they also expressly entitled Plaintiff to return of the earnest money "upon any termination of the Agreement pursuant to" those sections.  *See id.* §§ 3, 4.

Investigation for approval by Plaintiff's environmental consultant and lender; Plaintiff proposed that the closing "take place at a mutually acceptable time after receipt of the approvals." *See id.*, Ex. 6 [Doc. No. 40-6].

During the ensuing days and weeks, the parties exchanged correspondence concerning the Phase II Investigation, including the scope of the work to be done and their opposing positions concerning whether a report must be delivered before closing. Defendant reaffirmed its obligation under the Agreement to take any corrective action required by the report, once it was completed; however, Defendant insisted that the closing was not contingent upon the completion or delivery of any Phase II report.[4] Plaintiff, on the other hand, maintained that it had no obligation to schedule the closing until Defendant completed the Phase II Investigation and delivered a report, and Plaintiff approved it. More importantly with regard to the issue of entitlement to the earnest money, Plaintiff asserted that the Due Diligence Period had not ended because the period, as defined by the Agreement, contemplated the completion, and delivery of results, of the Phase II Investigation.

Finally, by letter dated June 24, 2010, Defendant's counsel provided Plaintiff's counsel with copies of laboratory data, analyses, and reports furnished by Envision, and stated that Defendant would allow Plaintiff's environmental consultant two weeks to evaluate and respond to the information. In the letter, Defendant's counsel stated: "By providing you with the Information, [Defendant] has satisfied all of the conditions precedent to closing under the Purchase Agreement and your external requirements, and the earnest money is now non-refundable." *See* Pl.'s Mot. Summ. J., Ex. 16 [Doc. No. 40-16], at 2. Two weeks later, Plaintiff's counsel responded with a copy

---

[4] At one point, Defendant, through counsel, proposed modifications of the Agreement to provide for certain laboratory work to be completed before closing, but this proposal was clearly presented as an offer of compromise and was promptly rejected.

of a letter from Plaintiff's environmental consultant, expressing concern about lead contamination shown by certain soil samples and recommending further testing and remediation. On July 27, 2010, when Defendant had not responded, Plaintiff requested "the contract be mutually terminated and the earnest money released." *See id.*, Ex. 19 [Doc. No. 40-19]. The parties' relationship deteriorated from there, with Defendant accusing Plaintiff of "attempt[ing] to manufacture a claim for termination." *See id.*, Ex. 20 [Doc. No. 40-20] at 2. This lawsuit followed.

## Discussion

The parties' cross-motions present two issues of contract construction: first, whether Plaintiff provided written notice of termination within the Due Diligence Period, as defined by the Agreement; and second, whether Defendant was required to complete the Phase II Investigation, and provide some form of report regarding the results, before closing. If the first issue is resolved in Plaintiff's favor, Plaintiff properly terminated the Agreement within the Due Diligence Period, and the second issue would become moot.

"The construction of an unambiguous contract is a matter of law for the court." *Walker v. Telex Corp.*, 583 P.2d 482, 485 (Okla. 1978); *see Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 545 (Okla. 2003). Moreover, whether a contract is ambiguous and requires extrinsic evidence to clarify the doubt is also a question of law for the court. *Pitco*, 63 P.3d at 545. "A contract is ambiguous if it is reasonably susceptible to at least two different constructions." *Pitco*, 63 P.3d at 545-46. The determination of whether a contract is ambiguous is made only *after* application of the pertinent rules of construction. *State ex rel. Commiss'rs of Land Office v. Butler*, 753 P.2d 1334, 1336-37 (Okla. 1987).

Oklahoma's statutory rules of construction establish that: the language of a contract governs its interpretation, if the language is clear and explicit and does not involve an absurdity (Okla. Stat. tit. 15, §§ 154, 155); a contract is to be taken as a whole, giving effect to every part if reasonably practicable, each clause helping to interpret the others (*id*. § 157);[5] a contract must receive such an interpretation as will make it operative, definite, reasonable, and capable of being carried into effect (*id*. § 159); words of a contract are to be given their ordinary and popular meaning (*id*. § 160); and a contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates (*id*. § 163). "The mere fact that the parties disagree or press for a different construction does not make an agreement ambiguous." *Pitco*, 63 P.3d at 545. Here both parties assert the contract provisions in question clearly support their respective interpretations; neither party argues the provisions are ambiguous.

The Court has carefully considered the Agreement in this case, and upon application of the foregoing principles, determines that the pertinent contractual provisions – when taken together and given an interpretation so as to make them operative, definite, reasonable, and capable of being carried into effect – are clear and unambiguous with respect to the Due Diligence Period. Thus, the construction of the contract is a matter of law for the Court, and the language of the contract is the only legitimate evidence of what the parties intended. *Pitco*, 63 P.3d at 545-46.

Section 6 of the Agreement entitled "Due Diligence Period" states in full as follows:

> From the execution and delivery of this Agreement until the acceptance of the Restoration Work <u>and as provided in Sections 3, 4, 5, 6, and 9 or other applicable provisions herein</u>, the Buyer may conduct any and all due diligence related to or involving the Property that the Buyer elects in its sole discretion, and the Seller shall

---

[5] "A contract must be considered as a whole . . . without narrowly concentrating upon some clause or language taken out of context." *Mercury Investment Co. v. Woolworth Co.*, 706 P.2d 523, 539 (Okla. 1985).

> reasonably cooperate with the Buyer in all such due diligence and shall provide the Buyer with copies of any documentation and information in the Seller's possession or control related to the utilities, construction, repair and maintenance of the Property.

*See* Agreement, § 6 (emphasis added). As stated above, the Restoration Work consisted of a well-defined list of tasks set out in an attached schedule, and plainly did not include any environmental investigation or work. Thus, Plaintiff's effort to include environmental issues in the Due Diligence Period rests on the emphasized phrase above, which refers to other provisions of the Agreement and, particularly, Section 5 regarding "Environmental Investigations."

As set forth above in the Statement of Facts, Section 5 contains numerous provisions, including one by which Plaintiff "accept[ed] the Phase I Report and the recommendations thereof." *See id.* § 5. This section expressly addresses Plaintiff's due diligence regarding environmental matters as follows:

> <u>In connection with the Buyer's due diligence and investigation</u> of the Property, the Buyer shall be prohibited from performing <u>any other</u> environmental "phase I" <u>or "phase II" type assessments or studies</u> of the Property unless such studies are (a) conducted by Envision, and (b) approved by the Seller in advance, in the Seller's sole discretion.

*See id.* (emphasis added). Thus, notwithstanding Plaintiff's right under Section 6 to engage in "any and all due diligence" that it chose "in its sole discretion" to perform, this right did not extend to an independent environmental investigation. Instead, further environmental investigation during the Due Diligence Period was to be undertaken by Defendant, which agreed to implement the Phase II Investigation recommended by Envision in the Phase I Report "[a]s soon as reasonably practical" and to obtain a report of the results "as soon as reasonably practical" after completing the Phase II Investigation. *See id.* §§ 5.1-5.2. The language of this provision is significant to the Court's analysis because it clearly links Plaintiff's "due diligence" to both Phase I <u>and</u> Phase II assessments.

("In connection with Buyer's due diligence . . . Buyer shall be prohibited from performing any other . . . "phase II" type assessments . . . .").

Defendant notes that it had no obligation to complete the Phase II Investigation within a particular time, and that a separate part of Section 5 addresses "Termination Rights," as follows:

> The Buyer acknowledges and recognizes the Seller's obligations, duties, and requirements to implement the Corrective Action under Section 5 herein. The Buyer may terminate this Agreement pursuant to Sections 3, 4, 5, 6, and 9 or other applicable provisions herein. The Parties acknowledge and agree that the Closing shall not be postponed for the completion of any of the remediation activities which may be required for the Environmental Matters related to the Seller's "Duties to Correct" under Section 5.3 to obtain a Discharge for any and all Environmental Matters; provided, however, the Seller shall use commercially reasonable efforts to obtain a Discharge for any and all Environmental Matters which are reasonably capable of being Discharged prior to the Closing. So long as the Seller is diligently taking such efforts, the Buyer shall not have the right to terminate this Agreement.

*See id.*, § 5.5. From this provision, Defendant argues that it had no duty to complete the tasks required by Section 5 prior to closing and that Plaintiff had no right to terminate the Agreement while Defendant was diligently working to perform its obligations with regard to Environmental Matters. This argument ignores the language of the Agreement, by which the parties agreed not to delay the closing while Defendant was performing any corrective action required by the Agreement, if Defendant was diligently making "commercially reasonable efforts" to perform its duties. Defendant could reach this point in Phase II only after the investigation had been completed, a report had been obtained, and corrective action had been determined to be needed. Accordingly, this provision does not support Defendant's position regarding the scope of the Due Diligence Period. In fact, this provision, like Section 5, supports a conclusion that completion of the "Phase II Investigation" as described in Section 5.1 was a necessary component of due diligence and not part of Defendant's post-closing duties. The performance obligations that expressly would not be

10

impediments to closing are described in Section 5.5 as those necessary to obtain a "Discharge" regarding "Environmental Matters," although any such items "reasonably capable of being Discharged prior to the Closing" were required to be completed. Common sense suggests that the discharge of identified environmental matters prior to closing would require a completed Phase II Investigation. More importantly, if the parties intended to allow the Phase II Investigation to be completed after closing, it could easily have been listed in Section 5.5, but it was not.

Accordingly, upon consideration of the entire Agreement under the applicable principles of construction, the Court rejects Defendant's contention that the Due Diligence Period could end without completing the Phase II Investigation and providing a report, as promised in Section 5.2. Further, the Court rejects Defendant's contention that the Due Diligence Period could end before Plaintiff had an opportunity to review the report. Defendant acknowledged in the Agreement Plaintiff's engagement of an environmental consultant for Plaintiff's "review and approval of the transactions contemplated by this Agreement." *See id*. § 5. This acknowledgment would be meaningless unless Plaintiff's consultant was given something to review and approve.

Under the undisputed facts of this case, Envision provided a report and results of the Phase II Investigation in June, 2010, and Defendant promptly provided the information to Plaintiff. Plaintiff obtained its consultant's review and opinion within the time period set by Defendant. Although Defendant now states its disagreement with the recommendation of Plaintiff's consultant, Defendant did not express that opinion prior to Plaintiff's notice of termination. The Agreement provided for a determination whether "Corrective Action," as defined therein, was needed at the conclusion of the Phase II Investigation. The determination had not been reached prior to Plaintiff's notice of

termination. Therefore, the Court finds that Plaintiff properly exercised its unconditional right of termination within the Due Diligence Period.

## Conclusion

For these reasons, the Court finds that Plaintiff is entitled to summary judgment in its favor and to payment of the escrow money.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 40] is GRANTED and Defendant's Partial Motion for Summary Judgment [Doc. No. 50] is DENIED.

IT IS FURTHER ORDERED that the parties shall file a joint notice informing the Court of the status of the escrow money, *see supra* note 1, within 10 days from the date of this Order.

IT IS SO ORDERED this 21st day of November, 2011.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE